**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

**GLORIA THOMPSON**                                                                       **PLAINTIFF**

v.                              **CASE NO. 3:10CV00127 BSM**

**BUTTERBALL LLC**                                                                        **DEFENDANT**

## ORDER

Defendant Butterball, LLC moves for summary judgment [Doc. No. 35] and plaintiff Gloria Thompson objects [Doc. No. 53]. Summary judgment is granted for the reasons set forth below.

### I. BACKGROUND

The record presents an interesting situation as it relates to the facts. In ruling on a motion for summary judgment, the court is required to view the evidence in the light most favorable to the nonmoving party. Here, Butterball filed a statement of undisputed facts [Doc. No. 36] along with its motion for summary judgment, as required by Local Rule 56.1. Each of its statements of fact is supported by references to the record, primarily to testimony given by Thompson in her deposition of June 1, 2011. In response, Thompson filed a statement of facts [Doc. No. 55] that admits some of the facts set forth by Butterball and denies other facts set forth by Butterball.

The problem with Thompson's statement of facts is that on the occasions in which she denies a statement of fact, she points to nothing in the record supporting her denial. In most circumstances, this court would overlook this failure to cite to the record in the statement of

facts given the fact that Thompson provides a rather lengthy facts section in her brief in opposition to the motion for summary judgment, which contains citations to the record. [Doc. No. 54]. Compounding matters is that, although Thompson gave sworn testimony in her deposition, attached as Exhibit B to Butterball's statement of facts [Doc. No. 36], she now objects to much of her deposition testimony in her statement of facts. Although the court is duty-bound to review the record in the light most favorable to Thompson, it would be unconscionable to find that there are genuine issues of fact in dispute simply because Thompson now refutes deposition testimony that she previously gave.

For these reasons, it is hereby determined that the facts are as follows. Thompson was hired as the human resources manager for Butterball's Jonesboro, Arkansas facility. Def.'s Statement of Undisputed Facts ¶ 3. Walter Davis, the director of human resources, was the hiring manager for Thompson's position and she reported to him throughout her employment. *Id.* ¶¶ 3, 19. Thompson started work on June 1, 2009, and, prior to that, received training from Butterball regarding employment eligibility verification. *Id.* ¶ 8.

Thompson's pre-employment training was provided by Border Management Strategies, a consulting firm engaged by Butterball to assist with its employment eligibility process and compliance. *Id.* ¶ 9. The training was conducted by Leigh Ann Mendoza, Butterball's former human resources manager, and Donna Carter, Butterball's human resources generalist. *Id.* ¶ 15. Thompson had previous I-9 auditing experience and recognized the importance of employment eligibility verification. *Id.* ¶ 10. During her training, Mendoza reviewed Butterball's I-9 process because Butterball placed particular

importance on I-9 compliance. *Id.* ¶¶ 11, 16. Thompson also received training in the process of administering performance improvement plans ("PIP") and assisted in the PIP process for at least one employee. *Id.* ¶ 18. In her first week on the job, Thompson received Butterball's employee handbook and signed an acknowledgment that she attended training and reviewed and understood all of Butterball's procedures and processes. *Id.* ¶¶ 13, 14.

Thompson's resume and application for employment, dated May 1, 2009, listed her address as 2612 Minx Lane, Jonesboro, Arkansas. *Id.* ¶¶ 4, 5. The letter offering Thompson employment with Butterball was sent to that same address and made no reference to relocation expenses. *Id.* ¶ 6. Thompson's previous job was in New York, but she moved to Jonesboro for family reasons. *Id.* ¶ 7.

Jodi Klecker was hired as a human resources manager at Butterball's plant in Longmont, Colorado in the fall of 2009. *Id.* ¶ 62. At the time of Thompson's hiring, Davis was involved in labor relations issues at Butterball's facility in Longmont, Colorado. *Id.* ¶ 20. Klecker received training specifically tailored to her role in Longmont, a unionized facility, including training related to the negotiations history at that facility. *Id.* ¶ 64. Klecker's application listed her address as Bloomsberg, Pennsylvania. *Id.* ¶ 65.

Butterball's human resources managers, of which Thompson was one, were responsible for conducting monthly audits of I-9 forms for employees hired and terminated at their facilities during the previous month. *Id.* ¶ 21. This audit included a review of Butterball's employment eligibility verification process wherein employee files were randomly reviewed to confirm that the established process was being followed. *Id.*

Thompson signed Butterball's "Employment Eligibility Manager Audit Long" on a monthly basis between July 2009 and February 2010, thus representing that she performed the monthly audits of the I-9 forms. *Id.* ¶ 22.

In June 2009, Butterball conducted a technical audit of I-9 forms of all active employees and all employees terminated in the preceding three years. *Id.* ¶ 23. Each human resources manager was required to conduct this new technical audit and, in late June 2009, Thompson received training on this new technical audit process via teleconference. *Id.* ¶¶ 24, 25. Thompson, however, did not perform the technical I-9 audit. *Id.* ¶ 27.

Davis conducted periodic audits of the employment eligibility verification process at Butterball's facilities and conducted such an audit at the Jonesboro facility in March 2009 and discovered that the process was not being conducted properly. *Id.* ¶¶ 35 - 37. Davis returned in December 2009 and discovered that Thompson failed to complete the technical I-9 audit and that there were other problems in the employment eligibility verification process at Jonesboro. *Id.* ¶ 40. Davis then communicated the results of the audit to Thompson and directed her to correct the deficiencies he had discovered. *Id.* ¶ 41.

Butterball's human resources managers were tasked with completing an HR audit and risk assessment and Thompson was made a team leader on the project. *Id.* ¶ 44. When Davis discovered that Thompson was not using the proper forms for this audit, Thompson corrected the error and provided revised documents. *Id.* ¶ 45. Davis then discovered that the revised documents contained other errors. *Id.*

Based on the deficiencies discovered during that audit, Davis prepared a memo to

Thompson on January 25, 2010, describing his concerns with her work and identifying areas for her to improve her performance. *Id.* ¶ 47. Thompson signed the memo, returned it to Davis, and indicated that she was working on those areas. *Id.* ¶ 48. Additionally, in an email on January 28, 2010, Thompson indicated that she had addressed or was addressing, nineteen separate issues discovered by Davis in his December 2009 audit. *Id.* ¶ 49. An audit of Jonesboro's I-9 process was conducted by Mendoza in February 2010 that revealed errors that remained uncorrected. *Id.* ¶ 50. On February 16, 2010, Davis presented Thompson with a performance improvement plan requiring her to develop an action plan to address the concerns he raised. *Id.* ¶ 51.

When Thompson failed to complete the action plan portion of the PIP which required her to state what actions she would take, Davis sent the PIP again with instructions to complete the action plan by March 5, 2010. *Id.* ¶¶ 53, 54. Thompson did not complete the action plan and, instead, emailed Davis on March 5 stating that she disagreed with his assessment of her performance. *Id.* ¶ 55. Because Thompson failed to complete her action plan, Davis sent Thompson home on March 8 for three days with pay. *Id.* ¶¶ 56 - 58. When Thompson continued to refuse to complete the action plan, Davis terminated her on March 12. *Id.*

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if, after viewing the evidence in the light most favorable to Thompson, no genuine issues of material fact exist and Butterball is entitled to judgment as a matter of law. *Nelson v. Corr. Med. Servs.,* 533 F.3d 958, 961 (8th Cir. 2008). Thompson


cannot survive the motion for summary judgment merely by pointing to disputed facts; the facts in dispute must be material to the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1985). If the facts alleged by Thompson, when viewed in the light most favorable to her case, would not allow a reasonable jury to find in her favor, then summary judgment should be granted in favor of Butterball. *Bloom v. Metro Heart Group of St. Louis, Inc.*, 440 F.3d 1025, 1029 (8th Cir. 2006).

### III. DISCUSSION

Thompson alleges she is the victim of disparate treatment under Title VII for failure to train, failure to pay relocation expenses, and termination; hostile work environment in violation of Title VII; and retaliation under the Americans with Disabilities Act ("ADA"). Summary judgment is granted on all claims.

A. <u>Disparate Treatment Claims</u>

In Title VII cases, a plaintiff may survive a motion for summary judgment by presenting "direct evidence of discrimination, that is evidence showing a specific link between the alleged discriminatory animus and the challenged decision sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007). Although Thompson asserts that there is direct evidence of discrimination in the record, the record does not support that assertion. Thompson asserts that she was asked how many "Hispanics or illegals" worked at the Jonesboro plant during an I-9 audit, and that because she is Hispanic, she believes this question was directly related to her ultimate

termination. This argument is weak considering the job Thompson was hired to perform. She was the human resources manager and was tasked with performing I-9 audits. The purpose of the I-9 form is to assure that employers are not employing illegal workers. Therefore, being asked how many "illegals" worked at the Jonesboro plant does not rise to the level of direct evidence of discrimination. Asking how many Hispanics worked at the plant could be directly related to Thompson's termination if there was something else in the record weighing on this issue, but there is not. This question, standing alone, is not enough to show direct evidence of discrimination, especially when it is viewed in the context in which it was asked.

"Alternatively, if the plaintiff lacks direct evidence of discrimination, the plaintiff may survive the defendant's motion for summary judgment by creating an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Id*. "Under the *McDonnell Douglas* framework, the plaintiff bears the burden of establishing a *prima facie* case of discrimination." *Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008). To meet her burden, Thompson must show that: (1) she is a member of a protected class, (2) she met the legitimate expectations of her employer, (3) she suffered an adverse employment action under circumstances that would permit the inference that unlawful discrimination occurred, and (4) similarly situated employees who are not members of the protected group were treated differently. *Gilmore v. AT&T*, 319 F.3d 1042, 1046 (8th Cir. 2003). If Thompson establishes this *prima facie* case, the burden shifts to Butterball to articulate a legitimate,

7

non-discriminatory reason for its actions. *Id.* If that burden of production is met, the burden shifts back to Thompson to demonstrate that the reason articulated by Butterball is merely pretext for unlawful discrimination. *Id.*

*1. Failure to pay relocation expenses*

This is a somewhat peculiar claim. This is true because Thompson's allegation that Butterball failed to pay her relocation expense would seem to be an argument she would make in the pretext stage of her unlawful termination claim. She, however, alleges this as an independent claim, and because that is how it is addressed by the parties, that is how it is addressed here.

Thompson fails to make out a *prima facie* case of discrimination based on this claim because she cannot show that she suffered an adverse employment action or that similarly situated employees who are not members of the protected group were treated differently. Thompson alleges that she was denied relocation expenses that were provided to Jodi Klecker, a white employee. Am. Comp. ¶ 17. While Thompson may have previously lived and worked in New York, she admits that, at the time she was hired, she was living in Jonesboro. Statement of Undisputed Facts, ¶¶ 4,5. Further, she moved to Jonesboro for family reasons, not for her employment with Butterball. *Id.* ¶ 7.

Thompson cannot show that she suffered an adverse employment action due to Butterball's failure to pay her relocation expenses when she did not relocate. She has also failed to show that similarly situated white employees were treated differently. Although she states that Jodi Klecker was paid moving expenses when she was hired by Butterball, the

record shows that Klecker was living in Bloomsberg, Pennsylvania when she was hired, and that she moved to Longmont, Colorado to work in Butterball's Longmont plant. Therefore, unlike Thompson, Klecker actually relocated upon being hired by Butterball. Further, Thompson cannot show that Klecker is "similarly situated in all relevant respects." *Cronquist v. City of Minneapolis*, 237 F.3d 920, 928 (8th Cir. 2001). To show this, Thompson would have to prove that Klecker received moving expenses even though she lived in Longmont, Colorado at the time she was hired.

For these reasons, summary judgment is granted on this claim.

### 2. *Failure to train*

Much like the previous claim, this is a claim that one would normally make in support of a pretext argument and not as a stand-alone claim. But, in that the parties address it as a separate cause of action, that is how it will be addressed here.

Thompson fails to make out a *prima facie* case on her failure to train claim because she cannot show that she suffered an adverse employment action or that similarly situated employees who are not members of the protected group were treated differently. Thompson alleges that she did not receive the same job training provided to Klecker, a white employee. Am. Comp. ¶ 17. She further alleges that she "was not provided any training or given any goals or job expectations." *Id.* ¶ 11. Thompson, however, admits that Butterball sent her to North Carolina for training before her employment began and that she received training regarding employment eligibility verification and I-9 forms. Statement of Undisputed Facts, ¶ 8. Furthermore, during her first week of employment in Jonesboro, Thompson was trained

by Leigh Ann Mendoza and Donna Carter on Butterball's I-9 and PIP processes. *Id.* ¶¶ 13-16, 18. Therefore, Thompson has not shown that she suffered an adverse employment action.

Not only has Thompson failed to support her claim that she received no training, but she has failed to show that Klecker was treated more favorably. Thompson's only knowledge of Klecker's training is derived from an email she received from Klecker stating that Klecker met with various people and Walter Davis trained her for a week in Longmont. Gloria Thompson Dep. 296, Jun. 1, 2011. The record, however, makes it clear that the training Klecker received was tailored specifically to her role at the Longmont plant which, unlike Jonesboro, is a unionized facility. Statement of Undisputed Facts, ¶ 64. Indeed, the record shows that Klecker's training related to the negotiations with the union and that Thompson had no need to receive this type of training. *Id.* ¶¶ 8-11, 13-16; Thompson Dep. 302. Further, even if there was evidence indicating that Thompson and Klecker were treated differently, it is clear that they were not similarly situated employees. *See Cronquist*, 237 F.3d at 928. Thus, Thompson cannot establish a *prima facie* case.

For all of these reasons, summary judgment is granted on this claim.

### *3. Termination*

Thompson has failed to establish a *prima facie* case on her termination claim because she cannot show that she was meeting the legitimate expectations or that similarly situated employees who are not members of the protected group were treated differently. Although Thompson strenuously argues that she was meeting her job expectations and that the problems Butterball was facing were the result of other employees' actions, the record is

replete with evidence that Thompson was engaging in either insubordinate conduct or unsatisfactory job performance. Thompson represented to the company that she had completed the monthly audits of I-9 forms between July 2009 and February 2010, though Davis found problems with the employment eligibility verification process in a December 2009 audit. Statement of Undisputed Facts ¶ 22, 40. Thompson was required to perform the technical audit of all I-9 forms for terminated employees but failed to do so. *Id.* ¶ 27. Davis, her supervisor, communicated his displeasure with this and asked her to correct these deficiencies. *Id.* ¶ 40.

When additional errors were discovered, Davis sent a memo to Thompson on January 25, 2010, describing his concerns with her work and identifying areas for improvement. *Id.* ¶¶ 44-45, 47. And, although Thompson indicates she was working on the identified areas, the record does not support this contention. Indeed, as set forth above, a February 2010 audit revealed that the errors remained uncorrected. *Id.* ¶¶ 48-50. Davis presented Thompson with a PIP which required her to develop an action plan to address his concerns on February 16, 2010. *Id.* at ¶ 51. Thompson failed to complete the PIP, so Davis sent it again with instructions to complete it by March 5, 2010. *Id.* ¶ 53-54. Thompson indicated she would not complete the action plan and was sent home. She was terminated only after she continued to refuse to complete it. *Id.* ¶¶ 55-58.

Even if Thompson could establish that she was meeting Butterball's expectations, her claim would fail because she has not produced any indirect evidence supporting an inference of discriminatory animus. This is the case because she cannot identify a white comparator

who was treated more favorably. Thompson alleges that Leigh Ann Mendoza, her white predecessor, was transferred, promoted, and given a pay raise despite her mismanagement of I-9 audits. Am. Compl. ¶ 45. Mendoza, however, is an inappropriate comparator because the record does not show that she and Thompson were similarly situated in all relevant respects. *See Cronquist*, 237 F.3d at 928. Indeed, nothing indicates that Davis instructed Mendoza to complete an action plan and that Mendoza failed to comply.

Even if Thompson could establish a *prima facie* case, she cannot overcome Butterball's legitimate non-discriminatory reason for terminating her, which is that Thompson failed to meet expectations, was put on notice of this failure, and did not comply. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000). Instead of pointing to evidence of prextext, Thompson merely argues that the reasons given for her termination lack credibility and that she was terminated because Butterball needed a scapegoat for its previous failures. Although Thompson may disagree with Davis's assessment of her performance and the decision to terminate her, this is not enough to overcome summary judgment. She is required to meet proof with proof. This is true because a court does not function as a super human-resources department that sits in judgment of an employer's management decisions. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999).

For all of these reasons, summary judgment is granted on this claim.

B. <u>Hostile Work Environment</u>

The record does not support Thompson's hostile work environment claim because she has produced nothing indicating that she experienced harassment based on her sex.

To establish a *prima facie* case of discrimination based on sex, Thompson must show that (1) she is a member of a protected class, (2) she was subjected to unwelcomed harassment, (3) the harassment was based on her sex, and (4) the harassment affected a term, condition, or privilege of her employment. *Duncan v. General Motors Corp.*, 300 F.3d 928, 933 (8th Cir. 2002). Thompson alleges that she "suffered sex discrimination from Deborah Lisella who created a hostile work environment for all women[.]" Am. Compl. ¶ 45. In her deposition, however, Thompson testified that Lisella made derogatory and condescending statements to both female and male employees. *See* Statement of Undisputed Facts ¶ 29; Thompson Dep. 154-55, 158-59, 162.

Thompson argues that, although Lisella treated both men and women in the same manner, a woman's perception is different. Pl.'s Resp. 34. Whether conduct constitutes discrimination based on sex is determined by whether members of one sex "are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 965 (8th Cir. 1999). Conduct occurring equally to members of both sexes cannot be discrimination based on sex. *Smith v. Hy-Vee, Inc.*, 622 F.3d 904, 908 (8th Cir. 2010); *Duncan*, 300 F.3d at 933. As the behavior creating the alleged hostile work environment was inflicted upon both males and females, without regard to sex, Thompson has failed to establish a *prima facie* case of sex discrimination.

For these reasons, summary judgment is granted on that claim.

C.  <u>Retaliation</u>

The record does not support Thompson's retaliation claim because she has not shown that she engaged in a statutorily protected activity.

To establish a *prima facie* case of retaliation, Thompson must show (1) that she engaged in statutorily protected activity, (2) that an adverse action was taken against her, and (3) a causal connection between the adverse action and the protected activity. *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1025 (8th Cir. 1999). Thompson alleges that she was retaliated against for advocating the rights of a disabled veteran. Am. Compl. ¶ 43. She alleges that the retaliation stems from a disagreement that Lisella had with James Henderson, a disabled veteran, over the stacking of some boxes. Thompson Dep. 174-176. Henderson was counseled for his inappropriate responses, but Thompson alleges that Lisella demanded that Henderson be fired or Lisella would find a way to have Thompson terminated. *Id.* 175. Thompson states, however, that she reports to Davis, not Lisella, and that she did not have to honor Lisella's request. *Id.* 199; Statement of Undisputed Facts ¶ 19.

Even if Thompson's actions are statutorily protected, which the record makes unclear, she cannot establish a causal connection between the protected activity and her termination First, Davis's undisputed testimony is that he agreed with the steps taken by Thompson to resolve the issues involving Henderson. Walter Davis Dep. 31, June 20, 2011. Further, Thompson's failure to complete the PIP as Davis directed occurred between the time the Henderson matter occurred and the time Thompson was terminated. Therefore it negates any inference of causation between the Henderson matter and her termination. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999). Second, Thompson presents no

evidence suggesting a causal connection between her dispute with Lisella and her termination, and the undisputed testimony of Davis establishes that Lisella had no input in his decision to terminate Thompson.  *See* Thompson Dep. 204; Statement of Undisputed Facts ¶ 59.  Third, and a far more remote consideration than the first two, is the fact that more than three months elapsed between the time the Henderson matter occurred and the time Thompson was terminated.  Therefore, these occurrences are probably too remote to support an inference of a causal connection.  *See Kipp v. Mo. Highway and Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002); *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 832-33 (8th Cir. 2002). Accordingly, summary judgment is granted on this claim.

## IV.  CONCLUSION

For the reasons set forth above, Butterball's motion for summary judgment [Doc. No. 35] is granted and Thompson's claims are dismissed with prejudice.

IT IS SO ORDERED this 30th day of March 2012.

_____
UNITED STATES DISTRICT JUDGE